UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DAVID N. RAIN, et al., | ) |
| | ) |
|   Plaintiffs, | ) |
| | ) |
|     vs. | ) CAUSE NO.  1:07-cv-1233-WTL-DML |
| | ) |
| ROLLS-ROYCE CORPORATION, | ) |
| | ) |
|   Defendant. | ) |

## ORDER FOLLOWING BENCH TRIAL

A bench trial was held in this case beginning on October 19, 2009.  The Court hereby renders its final decision regarding the matters presented at trial.[1]

### FINDINGS OF FACT

*The Parties and Their Prior Litigation*

Plaintiff David N. Rain is a citizen of New Jersey.  Rain is the sole shareholder and officer of Plaintiff Paramount International, Inc., ("Paramount"), which is a New Jersey Corporation with its principal place of business in New Jersey.  Defendant Rolls-Royce Corporation ("Rolls-Royce") is a Delaware Corporation with its principal place of business in Indiana.

Rolls-Royce manufactures a Model 250 aircraft engine that is commonly used in helicopters.  Since the late 1990s, a company named Aviall has had an agreement with Rolls-Royce pursuant to which it is Rolls-Royce's exclusive distributor of parts for the Model 250

---

[1] This opinion shall constitute the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a). Any finding of fact that is more properly considered a conclusion of law is adopted as such and vice versa.  In addition, the Court recognizes that there was conflicting testimony on some of the issues presented at trial and discussed herein.  The Court considered all of the evidence presented by the parties and the credibility of all of the witnesses in arriving at its findings of fact.

engine. Aviall supplies those parts to Rolls-Royce's "Model 250 FIRST Network," which is a group of "authorized maintenance centers" ("AMCs") and "authorized rework facilities" ("ARFs") around the world that service, repair and overhaul Model 250 engines.

Paramount is in the business of selling aftermarket parts for the Model 250 engine, which makes it a direct competitor of Rolls-Royce and Aviall. Among Paramount's customers are most of the AMCs and ARFs within the FIRST Network, as well as a small entity within Aviall that deals with overhaul parts. Paramount also purchases Model 250 parts from Aviall and the FIRST Network, and it uses the services of the FIRST Network to overhaul Model 250 engines, modules and parts that it acquires. In 2006, Paramount spent approximately $1.3 million purchasing parts from the FIRST Network and also made sales of parts to the FIRST Network of approximately the same amount. That same year Paramount made sales of approximately $250,000 to a Rolls-Royce facility in Brazil.

Rolls-Royce and Rain have a long and generally unpleasant history with one another. For example, Rain filed suit against Rolls-Royce in the mid-1990s and attempted to organize a class-action lawsuit against it in 2000. Rain also has sent letters to the Federal Aviation Administration complaining about Rolls-Royce and once circulated an unflattering email about Rolls-Royce. Finally, another federal district court recently ruled in a lawsuit between Rolls-Royce and a company called AvidAir that AvidAir misappropriated a Rolls-Royce document that Rain admits he provided to AvidAir.

In December 2005, Rolls-Royce filed suit in this district against Rain, Paramount and others alleging that the defendants had misappropriated Rolls-Royce intellectual property in the course of their business of manufacturing and selling aftermarket replacement parts for Rolls-Royce Model 250 aircraft engines. During a March 2006 settlement conference before a

2

magistrate judge, Rolls-Royce, Rain, Paramount and others reached a tentative settlement of that lawsuit. On May 19, 2006, the parties executed a formal settlement agreement ("the Agreement") and dismissed the lawsuit.

The Agreement provided, *inter alia*, that Rain and Paramount[2] would remain in the business of selling, servicing and repairing aircraft engines and parts, but that in doing so they would use only "publicly available information" as that term was defined in the Agreement. The Agreement also contained that following provisions:

> 2. MUTUAL NON-DISPARAGEMENT. None of the Parties will disparage the other . . . .
>
> 8. ENFORCEMENT.
>
> 8.4 If a material breach is proven by either party, the prevailing party shall be entitled to its attorneys fees plus damages, but not less than $1,000,000.

The Agreement also provided that it would be governed by and construed in accordance with Indiana law.

*The Heli-Expo*

The Helicopter Association International ("HAI") sponsors an annual event commonly known as the Heli-Expo. Each year during the Heli-Expo Rolls-Royce, Aviall and the FIRST Network members sponsor a private customer appreciation event for their most valued customers. Only invited guests with an appropriate pass may attend the event; the passes are distributed–for a price–to the FIRST Network members to give to those individuals they wish to invite. Rolls-Royce gave the following instructions regarding the use of the passes:

---

[2]Where appropriate, references to Rain throughout this Order should be read to refer to Paramount as well.

> These are to be used to invite your team members and more importantly your customers to these special events as a token of our joint appreciation of their loyal support throughout the year.

Rain considers annual attendance of the Heli-Expo to be important to his business, as it is a premier event for those in the international helicopter business community. Rain began attending the Heli-Expo and the private customer appreciation event in the mid-1980s and attended both every year until 2005, with the exception of 2000, when his son was born. He did not attend the customer appreciation event in 2005 and 2006 because of the ongoing litigation between him and Rolls-Royce. However, because that litigation had settled in 2006–although not all of the actions required by the Agreement had been completed–Rain decided to attend the customer appreciation event in 2007.

*The Incident at the 2007 Customer Appreciation Event*

Rain obtained a pass for the 2007 customer appreciation event ("the Event") from one of his customers–an AMC–while having lunch during the Heli-Expo. The pass indicated that he could catch a bus to the Event–which was called "Catch the Wave"–at the hotel at which he was staying. Rolls-Royce employee Mike Underwood was stationed on the bus to check that everyone boarding had a pass, which was intended to be worn around the attendee's neck on a lanyard. Rain knew who Underwood was, as the two had attended the same events in the past, but Underwood did not recognize Rain. Underwood greeted Rain, welcomed him to the Event, and gave him a ticket for a prize drawing; he did the same for all of the other people who boarded the bus.

The Event was held outdoors at a resort and was set up along a 300-yard walkway that formed a semi-circle between a pool area and a beach area. The bus arrived at the resort a few minutes before the official start time of 7:00 p.m., and Rain and the other passengers

disembarked and entered the Event at the "top" end of the semi-circle.  As Rain made his way along the walkways, he encountered Scott Crislip, President of the Rolls-Royce Helicopter Division, who was scheduled to give a speech later that evening at the Event.  He and Crislip had a very brief conversation during which Rain expressed his desire to speak to Crislip during the Heli-Expo, to which Crislip responded by giving Rain his cell phone number and telling him to call him the next day.  Crislip was aware of the non-disparagement provision of the Agreement and had instructed his staff to be courteous and professional should they encounter Rain during the Heli-Expo, and the exchange between him and Rain was just that.

After his conversation with Crislip, Rain proceeded further along the walkway, stopping along the way to have some refreshments.  Rain eventually encountered Tom Leonard, a Rolls-Royce employee whom he had known for many years, near the bottom of the semi-circle.  A provision of the Agreement required Rain to make certain quarterly reports to Leonard, and Rain took the opportunity to discuss with Leonard his preferences regarding the mechanics of making those reports.  The two had a polite conversation that lasted approximately five minutes.

During the conversation, Jeff Edwards, a Rolls-Royce vice-president, was told by Andrew Maasch, another Rolls-Royce employee that Rain was at the Event.  Rolls-Royce management had not considered the possibility that Rain would attend the Event, and therefore did not have a plan for how to (or whether to) react to his presence.  However, Edwards did not believe that Rain's attendance at the Event was appropriate in light of the history and recent litigation between him and Rolls-Royce, and Edwards also feared that Rain would somehow "bait" a Rolls-Royce officer or employee into making a disparaging comment about him so that he could bring suit under the anti-disparagement provision of the Agreement.  On his own initiative, therefore, Edwards approached Rain, told him that his presence at the event was

5

inappropriate, and asked him to leave. Maasch, followed Edwards over to where Rain was and stood in the vicinity while Edwards spoke to Rain.

Rain's response to Edwards' request that he leave the event was to question whether he was serious, to which Edwards replied that he would have security escort him out if he would not voluntarily leave. Rain asked to speak to Crislip, who was Edwards' boss, and Edwards pointed to the area where Crislip was preparing to give his speech, back up toward the top of the semi-circle. Rain began to walk in that direction; Edwards and Maasch followed him. By the time they reached the stage area, Crislip had begun his speech, making it impossible for Rain to speak to him. Rain instead had a brief conversation with Crislip's self-described "deputy," Rolls-Royce Executive Vice-President Kenneth Roberts, who reiterated what Edwards had told Rain: it was inappropriate for Rain to be at the event and he should leave. Edwards then directed Rain to exit the event through the hotel lobby, which was back at the bottom of the semi-circle opposite the area where they had walked to, and opposite the place where the bus had dropped Rain off at the event. The two men then made their way through the walkway to the hotel entrance, with Edwards following Rain.

Both the conversation between Edwards and Rain nor the conversation between Roberts and Rain were discreet and there is no evidence that they were overheard by anyone other than Rolls-Royce employee Leonard, to whom Rain was speaking when Edwards first approached him. As he was walking toward the hotel lobby entrance, Rain passed Eric Witters, an acquaintance of his, who was standing with several other people. Witters asked Rain where he was going, and Rain told him that he was "getting kicked out." Witters had noticed (but could not hear) the conversation between Rain and Edwards and thought that it was "out of the ordinary," but it was not disruptive and Witters did not recall it sparking any conversation

6

among the group he was standing with.

Rain was not the only person Rolls-Royce asked to leave the event that night. Andrew Maasch also approached Steve Van Hemert and asked him to leave. Van Hemert is the general manager of what he described as a "gray shop" that services Model 250 engines. The fact that Van Hemert and Rain had been asked to leave the event circulated among some of the other attendees, and many people later expressed to Van Hemert that they thought it was "ridiculous" that Rolls-Royce had asked him to leave.

During a meeting of representatives from all of the AMCs during the Heli-Expo, the fact that Rolls-Royce had asked some of the AMCs' invited guests to leave the Catch the Wave event was discussed. The consensus of the AMCs was that Rolls-Royce did not have the right to do so because the AMCs had purchased tickets to the event and therefore the AMCs should have been free to give to tickets to whomever they wished. If Rolls-Royce was unhappy with a particular invitee, the AMCs believed that the matter should have been brought up to the AMC who invited him rather than with the unwelcome invitee. That said, John Loney, who was chairman of the AMC council at the time, testified that he understood that it was not in Rolls-Royce's best interests for AMCs to purchase parts from anywhere other than its authorized sources; in other words, Rain and the company for which Van Hemert worked were competitors of Rolls-Royce, and Rolls-Royce strongly disliked the fact that the AMCs purchased parts from its competitors.

Rain felt embarrassed, humiliated, shaken up, and miffed by the fact that he had been escorted out of the event. In fact, he decided to leave the Heli-Expo a day early because he was afraid that he would inadvertently breach the confidentiality provision of the Agreement by discussing it with someone there.

## CONCLUSIONS OF LAW AND APPLICATION OF LAW TO FACTS

This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1). The Plaintiffs' complaint asserts a claim for breach of contract; the Plaintiffs also seek declaratory judgment and injunctive relief.

The issue in this case is straightforward: Did Rolls-Royce's treatment of Rain at the Catch the Wave event violate the non-disparagement clause in the Agreement? The non-disparagement clause is clear and unambiguous, providing simply that "[n]one of the Parties will disparage the other."

> Under Indiana state law, the court's goal in interpreting a contract is to "give effect to the parties' intent as reasonably manifested by the language of the agreement." *Reuille v. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771 (Ind.2008). Indiana follows the rule that "extrinsic evidence is not admissible to add to, vary or explain the terms of a written instrument if the terms of the instrument are susceptible of a clear and unambiguous construction." *Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 532 (Ind.2006) (citation omitted). Therefore, unless the terms of a contract are ambiguous, they will be given their plain and ordinary meaning. *Reuille*, 888 N.E.2d at 771.

*Holmes v. Potter*, 552 F.3d 536, 539 (7th Cir. 2008). Thus, the resolution of this case hinges upon the plain and ordinary meaning of the word "disparage."

Black's Law Dictionary (7th ed. 1999) defines "disparage" as ""[t]o dishonor (something or someone) by comparison" or "[t]o unjustly discredit or detract from the reputation of (another's property, product or business)." The Court finds this to be the plain and ordinary meaning of "disparage" and the meaning of the word as used in the Agreement. The Court further finds that Rolls-Royce's treatment of Rain at the Catch the Wave event did not constitute "disparagement."

Rain seems to equate "disparage" with "embarrass " or "treat with hostility." The Court does not doubt that Rain was embarrassed when he was escorted out of the event, and it is not

unreasonable to characterize the interaction between Rain and Edwards as hostile to some degree; telling someone that they are not welcome someplace is, perhaps, an inherently embarrassing and hostile situation. However, the Agreement does not, as Rain suggested in his testimony, provide that there would be "no hostilities" between the parties or that the parties would be "friendly" to each other. *See* Trial Transcript Vol. I at 97, 98. What the Agreement provides is that the parties will not "disparage" one another, the plain meaning of which requires that the interaction in question be related to Rain's (or Paramount's) reputation or honor. Even in the absence of any prior litigation or any allegation or belief on the part of Rolls-Royce that Rain or Paramount had done anything improper, the fact is that Paramount directly competes with Rolls-Royce in the Model 250 parts market. The fact that Rolls-Royce did not want such a competitor to attend a private event that was designed to reward its "loyal" customers is not surprising, and that is especially true in light of the recent litigation between the parties. The act of escorting Rain out of the event was not designed to, and in fact did not, detract from Rain's reputation as a businessman or carry with it any inherent message regarding his character, his products or his business dealings.[3] Rather, the only message inherent in Rain being asked to leave the Event is that he–like Van Hemert–was not a member of the group the event was designed to reward: rather than being a loyal Rolls-Royce customer, he was, primarily, a Rolls-Royce competitor. One could, like the AMCs did, debate whether Rolls-Royce acted appropriately or wisely in asking Rain to leave after he had been invited by an AMC to attend, but regardless, Rolls-Royce did not "disparage" Rain by its actions that night.

---

[3] Quite to the contrary, if any reputation was sullied by the incident it was that of Rolls-Royce; as John Loney testified, the AMCs–who are important business partners of Rolls-Royce–were angered by the incident and felt that it was "not Rolls-Royce's brightest moment."

## CONCLUSION

For the reasons set forth above, the Court finds that Rolls-Royce did not breach the non-disparagement provision of the Agreement by its actions at the Catch the Wave event. Judgment therefore will be entered in favor of Rolls-Royce and against the Plaintiffs on the Plaintiffs' complaint as it relates to the Event.

SO ORDERED: 01/07/2010

*William T Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification